## 9092

### FEWELL v. HALL ET AL.

### (85 S. E. 590.)

CREDITOR'S ACTIONS.  STATUTE OF ELIZABETH.  FRAUDULENT CONVEYANCES.
BADGES OF FRAUD.  ESTOPPEL.  DEEDS.  VALIDITY.

1. ESTOPPEL—RELIANCE ON APPARENT OWNERSHIP.—Where the evidence
shows that a purchaser when making a contract for future sale and
delivery of cotton, made no inquiries or examination into the title
of lands occupied by the seller, who did nothing to mislead him with
reference to the title, and inquired only into, and relied upon, the
apparent ability of the seller to grow and deliver the cotton, a find-
ing that the purchaser, in making such contract, extended credit to the
seller upon faith in his apparent ownership of the land, was erro-
neous.

2. CREDITOR'S ACTIONS.—The relation of debtor and creditor does not
arise upon the making of a contract for future sale and delivery, but
depends upon a future contingent and uncertain event.

3. ESTOPPEL.—The circumstance that a negro woman, not familiar with
the technical rules affecting titles, signed in transactions with supe-
rior white men, renunciations of dower in lands mortgaged by her
husband, held not sufficient to estop her from asserting her title to
such land.

4. FRAUD—BADGES—REBUTTAL.—A conveyance of land by a husband to
his wife, for an expressed voluntary consideration, is a badge of
fraud, which calls for explanation, and when explained is rebutted.

5. DEEDS—BONA FIDES.—The execution of a deed by a debtor, after the
relation of debtor and creditor has arisen, but in pursuance to a pre-
existing bona fide purpose and intent, is not a fraud upon the
creditor.

6. FRAUDULENT CONVEYANCES—CONVEYANCE BY HUSBAND TO WIFE—
FRAUDULENT AS AGAINST HUSBAND'S CREDITORS—EVIDENCE.—On the
issue whether a deed executed for a recited nominal consideration
by a husband to his wife was made with fraudulent intent as against
his creditors, the fact that a reputable attorney who drew the deed
was alone responsible for the insertion of the recited consideration
must be considered.

7. EVIDENCE—DECLARATIONS—OWNERSHIP OF PROPERTY BY WIFE—ACTS
OF HUSBAND.—That a husband stored in his own name property, and
deposited in a bank the proceeds on a sale thereof, are but declara-
tions in his own interest, and not binding on the wife, claiming the
property and the proceeds.

8. FRAUDULENT CONVEYANCES—TRANSACTIONS BETWEEN HUSBAND AND
WIFE—RIGHTS OF CREDITOR OF HUSBAND.—Where at the making of
a contract to purchase land in the name of a husband, and at the
execution of a deed to him, it was the bona fide understanding of the

husband and his wife that the purchase was for her, and thereafter a deed was executed by him to her to carry out the intent, the transaction was valid as against a creditor of the husband who became such after the deed to the husband, unless the wife was estopped from setting up her title.

9. DEEDS—BONA FIDES.—Where a contract for the purchase of land was made in 1908, in the name of A., but for the benefit of N., who made the initial payment thereon, the subsequent execution of a deed of conveyance from A. to N. to carry out the original *bona fide* intention of the transaction, does not operate as a fraud upon A.'s creditors.

Before MOORE, J., York, August, 1914.    Affirmed.

Action by Ed Fewell against Allen Hall, Nannie Hall, J. W. Johnson, W. G. Stevens and C. E. Spencer. From judgment for plaintiff, the defendants, Allen Hall and Nannie Hall, appeal. The facts are stated in the opinion.

*Messrs. Spencer, Spencer & White,* for appellants, cite: 56 S. C. 154; 55 S. C. 198.

*Messrs. Dunlap, Dunlap & Hollis,* for respondents, cite: 82 S. C. 98; 57 S. C. 110; 32 S. C. 186; 40 S. C. 11, and 52 S. C. 472.

May 4, 1915.

The opinion of the Court was delivered by MR. JUSTICE GAGE.

The Circuit Court held that the deed from Allen Hall to his wife, Nannie Hall, was voidable under the Statute of Elizabeth; and that is the issue here, upon appeal by Allen and Nannie.

The plaintiff sues as a judgment creditor. The parties defendant, other than the Halls, are mortgage creditors, and about the last named there is no contest.

There are five exceptions, three by Allen and two by Nannie; but there is really but one primary issue in the cause, and that is stated in the outstart. The exceptions

merely suggest errors by which the Court reached the conclusion that the deed was voidable; or they suggest reasons why a different conclusion should have been reached.

The history of the case is this: Allen and Nannie are negroes and husband and wife; the plaintiff is a cotton buyer; the other defendants are white mortgage creditors. Allen and Nannie bought from Johnson and Stevens in August, 1908, a small parcel of land containing 100 acres, for which they agreed to pay $35 per acre, or a total of $3,500. Of the purchase price there was paid down $350, and thereafter $650 was paid on the 1st January, 1909, making a total payment of one thousand dollars; and the balance of twenty-five hundred dollars was set to be paid in six yearly installments of four hundred sixteen and 66-100 ($416.66) dollars, the last to be due not until 1st January, 1915.

Johnson and Stevens' contract to sell was in terms with Allen, and the deed was made to him 28th December, 1908, and Allen conveyed by mortgage to them to secure the balance of the purchase price.

And Allen thereafter conveyed the land to five other persons by way of mortgage, generally to secure payment of borrowed money, and on most of these conveyances Nannie renounced her dower. These mortgages run, in time, from December, 1908, to March, 1912, and one of the mortgagees—Wright—is not a party.

On 15th of May, 1909, Allen made a contract with the plaintiff to deliver to him during the month of October thereafter thirty bales of cotton for the price of ten cents.

When October came and went cotton had advanced above ten cents and Allen did not deliver the cotton.

On 3d November, 1909, Allen conveyed the land by deed to Nannie, and the consideration was expressed therein to be one dollar and love and affection.

On the 16th of March of the next year (1910) the plaintiff sued Allen for a breach of his cotton contract, and

on 25th of April, 1910, judgment thereon for $620.40 was
rendered for Fewell against Allen.   And this is the debt
invoked against Nannie's title.

The decision must turn largely on one transaction, it is
a matter of fact, and it is this: when the contract to pur-
chase was made in August, 1908, and when deed was made
by Johnson and Stevens to Allen on 28th December, 1908,
was it the *bona fide* intent of Allen and Nannie at these
times that the purchase was made for Nannie; and was
the deed of November, 1909, made to carry out that intent
formed aforetime?   If the answer is yea, then the transac-
tion assailed was lawful, and the decree of the Circuit Court
is wrong, unless Nancy is estopped now to set up her title
against Fewell.

Around these issues the testimony ranges itself, and its
right interpretation must conclude the question.   The only
difficulty in the case, if such there be, is to ascertain the
truth from the testimony.   The law is plain.

The referee who heard and saw the witnesses made no
conclusions of fact, he simply reported the testimony.

Ahead of a consideration of the chief issue and block-
ing its way, is the conclusion of the Court that even though
the transaction between Allen and Nannie was what
they claim for it, yet it may not be allowed against
Fewell, because he extended credit to Allen upon
the faith of Allen's apparent ownership.

The following is all the testimony of the plaintiff there-
about, direct and cross:

"Q. Did you know whether or not Allen Hall owned
any land, Mr. Fewell?   A. Yes, sir; I did.   Q. State
whether or not this contract for thirty bales of cotton was
based upon that knowledge?   A. It was.   Q. State
whether or not, Mr. Fewell, you would have contracted
with Allen Hall for as many bales of cotton as that unless
you knew that he had the control of land and property
sufficient for him to deliver that?   A. I would not to

16—101

any unreasonable extent, with the *knowledge I had of Allen's ability to deliver.* Now, I could go into some explanation of that contract right there by a statement as to his ability to deliver or not, if it is in order. Q. Well, does it refer to this land? A. Well, yes, sir; it refers to this land. Q. All right, sir, just state it. A. Allen wanted to sell me forty bales of cotton and he came to me and I objected to buying so much, telling him that it was a serious proposition, and that whether it was up or down I wanted him to understand that he had the cotton to deliver, and I asked him the question if he *was sure that he would make forty bales,* that I didn't feel disposed to buy so much from him, for I didn't want him to sell himself into any hole, and my recollection is that he said that he expected to make quite a good deal more cotton than that, some fifty or sixty bales or something like that, perhaps more, and, not wishing to buy forty bales, I suggested to him—I asked him—if Mr. J. B. Johnson wasn't interested with him in the land he had bought, and he said he was in a way. Well, I says, suppose you go and talk to Mr. Johnson before you sell all of that cotton and see what he has to say about it, whether he will advise you to do it or not, and he took my suggestion and went and talked with Mr. Johnson, at least he went off and came back, and I was sitting in a buggy right in front of this building, and he came back and said Mr. Johnson said may be he had better not sell but thirty bales, he thought he would be safe in selling thirty bales, and I told him all right, I would just buy the thirty bales, that I thought better of it myself. Q. Mr. Fewell, at the time of the contracting with Allen Hall for this cotton, did he or not give you any information that would lead you to believe that the title to this property was in his wife, or that he was dealing for her as her agent, or anything like that? A. *Not a word.* Q. Except as to the interest of J. B. Johnson, and I believe you said Dr. Stevens, did he intimate to you that anybody

else had anything to do with that farm? A. He did not; no, sir. Q. Mr. Fewell, you made those trades with farmers because they are farmers? You didn't have their title looked into in advance of making these contracts for the cotton futures? A. That depends on who they are and whether I know them or not. Q. Well, you didn't make any examination in this case, did you? A. *I. did not; no, sir.* Q. You knew that Allen was a farmer, or was farming? A. Yes, sir. Q. And that is about all that you did know? A. Well, I had a pretty general knowledge of his stand. *I knew he had bought this land.* Q. How did you know that he had bought this land? A. Well, *I knew it because he told me so."*

We are of opinion that this testimony is not sufficient to show that the plaintiff was misled by Allen's apparent ownership. The plaintiff relied on Allen's *ability to grow* the thirty bales; not on his responsibility consequent on his failure to grow. "I asked him if he was sure he would make forty bales." The plaintiff did not examine the record to ascertain if Allen owned the land in fact.

The plaintiff never testified that Allen told him that the title was in himself.

The plaintiff testified, in the language of the question not his own, that Allen gave him no information that would lead him to believe that the title was in the wife; he did not say Allen gave him information to lead him to believe that the title was in himself. If the plaintiff knew Allen had the title, then he knew that it was then encumbered with a $2,500 mortgage, and was worth nothing over that plus a homestead and a dower.

When the cotton contract was made Allen was not Fewell's debtor; *non constat,* but that in the following November Fewell might be Allen's debtor. The true status depended upon an uncertain event, to wit, the price of cotton in November. That was the

event both parties had their minds on when they made the contract.

The testimony of Fewell about a reliance upon Allen's apparent ownership is manifestly an afterthought. It does not nearly make out a case of misleading.

The real inquiry in the case then, presents itself disencumbered.

And before we consider the testimony of the witness touching *intent,* some reference will be made to the circumstances of the transaction, so much relied upon by the Court to prove fraud.

But the circumstances will be so stated as may modify the inference which has been drawn from them. And along with the circumstances we state, as closely akin to them, assumptions of fact, the correctness of which will not be denied.

The Halls are negroes; they were dealing with white men far superior to them in all respects; the negro will generally sign any sort of paper which a superior white man will direct him to sign; Allen was the agent of his wife about all the business when it came to dealing with third persons; that is generally the rule both with white women and black women; that is why before 1868 the law regarded the two as one; that is why since 1868 the fact generally regards them still as one; this woman was, and women generally are, not familiar with the technical conception of titles, and that includes dower; they sign when and where they are told to sign, and generally ask no questions; the renunciation of dower is by a too loose practice, but a formal act. It ought not to be so; but it is.

We do not declare that women shall not be held to their contracts; they shall; but these conditions and assumptions often explain their contracts, and help to ascertain the truth of the case. Again, the cotton contract was an unusual transaction, the Halls got no money when they made it,

and it would be remarkable if they comprehended all the obligations and liabilities which sprang out of it. The land was already, in May, 1909, and November, 1909, heavily encumbered and was of small, if any, value over the mortgage debt and the homestead. The land very soon after November, 1909, fell again under a new mortgage. Two mortgages were put upon it after November, 1909, and before the plaintiff sued in March, 1910.

In all these transactions and in all the testimony there is nothing to show Allen and Nannie were *planning* and *intending* to defeat the plaintiff; their ship was about to flounder from other causes, and they were struggling to escape them, and not the plaintiff's hitherto uncertain claim.

It is true the circumstances—that the deed in issue was made by a husband to his wife, for an expressed nominal consideration; and it is true that by the law these are badges of fraud. But a badge on a man's breast is no conclusive proof of what he is; the badge cannot speak more certainly than the man speaks; if the man speaks truly, and if his witnesses do the same. The badge is only presumptive, and calls for an explanation from him who wears it.

It is a circumstance of much import that the deed in issue was drawn by a lawyer of established character, that the deed from Johnson to Allen was executed in the office of another lawyer of like character, and that the writer of the deed in issue inserted the consideration in the instrument and was alone responsible for stating that consideration as it was stated.

About the signing of the deed from Stevens and Johnson to Allen, Mr. C. W. F. Spencer testified:

"When Allen Hall and his wife came in I read the papers over to them, and as soon as Nancy Hall understood that the deed was drawn to Allen Hall and the note and mortgage to be executed by him, she said that the papers were

not properly drawn, that she had bought the land, and the deed ought to be made to her. They stayed in my office about half an hour, and I told them that I didn't have time to prepare any new papers. They went out and stayed awhile and came back, and finally Nancy Hall asked if Allen could convey her the property afterwards, and I told her that he could. I remember positively that both Allen Hall and Nancy Hall said that the deed should have been drawn to Nancy Hall. I remember to have told them that the deed was drawn to Allen Hall, because the contract was originally made by Allen Hall, but they both said that the land was to be conveyed to Nancy Hall. The papers were then executed, and I returned them to Mr. Spencer. That is all I know about it. Q. Did they agree upon the execution in that form before you told them that he could make the transfer at any time? A. The papers were executed afterwards. Q. And they both understood by being advised by you that that could be done at any time that they saw fit to make the change? A. Yes, sir."

About the preparation and signing of the deed in issue Mr. C. E. Spencer testified:

"She made strenuous claim here in the office some time during the year after the papers were sent to Rock Hill that the papers ought to have been drawn otherwise, drawn between her and Stevens and Johnson. I answered her that her husband had the contract in his own hand, and he had not told me anything about her interest, and for that reason they were drawn the way they were drawn; that I would just as readily have drawn them the other way if I had been notified to do so. She protested that the land belonged to her; insisted on it, and finally the paper was drawn up between them transferring the land to her. I don't recollect the date of that paper. Q. Do you recall anything of the date when she made the protest? Have you anything to show? I will give you the date of

the transfer. (Witness shown Exhibit B.) A. Allen Hall to Nannie Hall. Q. Yes, sir. I am referring to the protest now. A. Yes, sir. I understand; I can't recall when the protest was made; whether it was made at the time of this deed or before the making of the deed. I know that when she called the matter to my attention I took the matter up with my son, and he then stated to me that at the very beginning when these papers were executed she commenced to kick. But when that took place I don't remember. I know that I had no reason to doubt the statement; at the same time I knew nothing about it, and for that reason when the papers were drawn making the transfer I was particular to name a consideration that would leave the whole matter absolutely open, because I didn't want to get mixed up in the effort to hinder and delay creditors; and if you will look you will see the consideration is for love and affection; knowing that if she had any right she could establish it, and the consideration could be used one way or the other."

"I will state that one reason for stating my recollection is that I believe if I had known of the Nancy Hall claim at the time that deed was drawn that I would have recited the true consideration for it. It would have been the perfectly natural thing for a lawyer to do instead of the consideration I did recite; and I am inclined to think I didn't know anything about it at that time. But I may have known of this Fewell claim, and knowing the Fewell claim had been contracted before this—perhaps did—in order to protect the thing from any semblance of fraud so far as the deed would go, I cited the consideration as love and affection. I think that that was done more to hold the bars down between Allen and his creditors rather than to hold them up."

There is no testimony to refute these statements, and they are taken as true.

If that be so, the fact is established that before the cotton contract was ever made a lawful intent was formed by Allen and Nannie; and but three days after the cotton contract was breached, that intent was executed by them.

It is plain that if Nannie paid the cash installment of $350 on the purchase price with the understanding then between her and Allen that the title was to be made to her, then such contract was good against the world, except encumbrances and creditors subsequent thereto without notice, but the plaintiff does not fall within the exception.

The conclusion of the Circuit Court on the issue of intent was rested almost exclusively on the badges referred to, and on the circumstances recited; the Court, we venture to think, did not give enough heed to the undisputed testimony of the Spencers which fixed certainly the *bona fides* of the parties before the cotton contract was ever entered into.

There remains yet to consider if the wife paid the cash installment of $350.

But so far as the plaintiff is concerned, if the *bona fide* agreement between Allen and Nannie at the time of the purchase was that the title was to be made to her, and that the purchase was made for her, then equity will consider that to have been done; and if that was done, it matters not so far as the plaintiff is concerned who made the initial or the subsequent payments.

Nevertheless we think there was no warrant to discredit the uncontradicted testimony of Nannie that she made the initial payment of $350. The cross-examination brought out all the facts relevant thereto. There is no question but that the money proceeded from the sale of seven or eight bales of cotton which had been grown on the same lands which are in issue. It is true the cotton was stored in the name of the husband, and the proceeds of sale was deposited in bank in his name; but that is not conclusive of the fact of ownership, else a husband might con-

vert all the wife's property by marking it as his own.    The acts were but declarations of the husband in his own interest.

Nobody has yet fixed the limit of a thrifty woman's capacity to save, and thus turn into dollars the cents which a more prodigal husband would waste.    Reliance is put by respondent upon the manner in which the woman testified.    He contends that the woman's testimony and the way she gave it discredits her good faith.    It is true she made an indifferent witness; but she was a negro woman of poor capacity when set against the astute counsel who pressed her to answer many questions.

We are, therefore, of the opinion that the plaintiff did not prove the case he set out to prove, and as to him the judgment of the Circuit Court is reversed.

But since there are defendants other than the Halls who are in fact plaintiffs, and may desire relief, the cause is remanded to the Circuit Court, for such orders and decrees to be had as the parties in interest may desire.

Mr. Justice Fraser was disqualified and did not take part in the consideration of this case.